<pre>
 1                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3   UNITED STATES DISTRICT COURT      ) 1:23CR261-1

 4   v.                                ) WINSTON-SALEM

 5   KIERRE ANTHONY CUTLER             ) March 20, 2024

 6

 7

 8              TRANSCRIPT OF THE SENTENCING HEARING
             BEFORE THE HONORABLE LORETTA C. BIGGS
 9                 UNITED STATES DISTRICT JUDGE

10

11                         APPEARANCES:

12

13   FOR THE GOVERNMENT:

14           KENNEDY GATES
             U.S. Attorney's Office
15           Middle District of North Carolina
             101 South Edgeworth Street - Fourth Floor
16           Greensboro, North Carolina  27401

17   FOR THE DEFENDANT:

18           AMES CHAMBERLAIN
             Federal Public Defender's Office
19           301 North Elm Street - Suite 410
             Greensboro, North Carolina  27401
20           (336) 631-5278

21   COURT REPORTER:

22           STACY HARLOW, RVR-M, CVR-M, CM, RBC, RCP
             Post Office Box 21471
23           Winston-Salem, North Carolina  27120

24
     Proceedings recorded by voice stenography realtime translation.
25        Transcript produced by computer-aided transcription.
</pre>

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

```
1                    P R O C E E D I N G S
2              (Wednesday, March 20, 2024, at 12:20 P.M.  The
3    defendant appearing in person, in custody.)
4              MS. GATES:  May it please the Court.
5              THE COURT:  Yes, ma'am.
6              MS. GATES:  The next matter before the Court is the
7    United States versus Kierre Anthony Cutler, that's in file
8    number 1:23CR261-1.  He's represented by Ames Chamberlin.  The
9    matter is on for sentencing.
10             THE COURT:  All right.
11             Good afternoon, Mr. Chamberlin.
12             MR. CHAMBERLIN:  Good afternoon, Your Honor.
13             THE COURT:  You represent the defendant in this
14   matter?
15             MR. CHAMBERLIN:  I do.
16             THE COURT:  The record reflects that on October 5th,
17   the defendant pled guilty to distribution of child pornography.
18             In advance of the hearing, I have reviewed the final
19   presentence report and its appendix, Defendant's sentencing
20   memorandum, the psychological report that was done, Defendant's
21   position paper, the government's sentencing memoranda, letters
22   of support, as well as the stipulation of restitution that was
23   filed by the government.
24             Are there other documents you request I review at
25   this time?
```

```
 1              MR. CHAMBERLIN:  No, Your Honor.  Thank you.

 2              THE COURT:  All right.

 3              Ms. Gates, do you have witnesses or victims in the

 4    courtroom and are you expecting an evidentiary hearing?

 5              MS. GATES:  There are no witnesses -- there are no

 6    victims in the courtroom.  There are no witnesses.  There

 7    are -- the detective from the case is here, but we don't intend

 8    on calling him, Your Honor.

 9              THE COURT:  All right.  Thank you.

10              Mr. Chamberlin, have you received a copy of the

11    presentence report?

12              MR. CHAMBERLIN:  Yes, Your Honor.

13              THE COURT:  Have you and your client read and

14    discussed that report?

15              MR. CHAMBERLIN:  Yes, Your Honor.

16              THE COURT:  Have you and your client discussed what

17    if any objections that you have -- that he has to this report?

18              MR. CHAMBERLIN:  Yes, Your Honor.

19              THE COURT:  Are you, sir, expecting an evidentiary

20    hearing and do you have witnesses in the courtroom?

21              MR. CHAMBERLIN:  We're not expecting an evidentiary

22    hearing, and we don't have any witnesses that we intend to

23    call.

24              THE COURT:  All right.

25              Sir, Mr. Cutler, if you would stand, please.
```

1          THE DEFENDANT:  (Complies.)

2          THE COURT:  Sir, have you reviewed the presentence

3    report with your attorney?

4          THE DEFENDANT:  Yeah.

5          THE COURT:  I'm sorry?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Are you satisfied that you understand the

8    contents of the presentence report?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Have you discussed with your attorney any

11    objections you may have to that report?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Are you prepared to proceed with

14    sentencing on today?

15          THE DEFENDANT:  Yes.

16          THE COURT:  All right.  Sir, you may be seated.

17          THE DEFENDANT:  (Complies.)

18          THE COURT:  There being no objections to the PSR, the

19    Court hereby adopts the presentence report without change.  As

20    to all matters in the presentence report, the Court adopts as

21    findings of fact.

22          We will now move to the imposition of sentence and

23    the determination of the advisory guideline range.

24          In determining the sentence to be imposed, the Court

25    must first calculate the applicable guidelines, which are

1  advisory.  The total offense level here is a 34, criminal

2  history category is a I.  Imprisonment range is 151 months to

3  188 months.  The guideline supervised release range is 5 years

4  to life.  Fine range is $35,000 to $250,000.  Restitution has

5  been determined at $13,000; that's the stipulation in Document

6  28.  Special assessment of $100.

7          Mr. Chamberlin, do you agree that those are the

8  applicable guidelines calculations in this case?

9          MR. CHAMBERLIN:  We do, Your Honor.

10          THE COURT:  All right.

11          And, Ms. Gates, do you so agree?

12          MS. GATES:  Yes, Your Honor.

13          THE COURT:  The Court has considered the calculations

14  resulting from an application of the guidelines and find that

15  they were appropriately determined.  The offense of conviction

16  carries a five-year mandatory minimum sentence.

17          I have no request for departures.  Mr. Chamberlain,

18  are you requesting a departure?

19          MR. CHAMBERLIN:  No, Your Honor.

20          THE COURT:  Are you requesting a departure, Ms.

21  Gates?

22          MS. GATES:  No, Your Honor.

23          THE COURT:  All right.

24          The Court finds there is no basis for departure.

25          Mr. Chamberlin, I will hear from you with respect to

1    the 3553(a) factors.

2              MR. CHAMBERLIN:  Thank you, Your Honor.  Your Honor,

3    there are some people that are here to support Kierre.  I

4    wanted to introduce them to the Court.  First --

5              If you would stand.

6              His mother, Latasha Hariston.  She obviously wrote

7    the character reference letter.

8              THE COURT:  Yes.

9              MR. CHAMBERLIN:  And -- and then his -- his aunt,

10   Tiffany Davis Green, is present; and an uncle, Elliott Green,

11   are present.  And they just want the Court to know that they'll

12   be supporting Mr. Cutler moving forward.

13             THE COURT:  Thank you for being here.

14             You may be seated.

15             MR. CHAMBERLIN:  Your Honor, we -- we certainly

16   acknowledge that the offense conduct is -- is very, very

17   serious in this case, and all the surrounding conduct.

18             We -- we first ask -- and know the Court's aware of

19   this -- this argument, but I would ask the Court to consider

20   the -- the excessive nature of the child pornography guidelines

21   in that most of the enhancements are present now in every

22   single case.  The -- the material involving prepubescent

23   minors, the use of a computer, the number of images, the

24   sadistic and masochistic images are present in just about

25   every -- every case of this nature.

1          And enhancements that apply in every case are not

2    consistent with the purpose of enhancements.

3          THE COURT:  I consider two enhancements that I

4    don't -- I don't generally apply, that's the computer and that

5    is the number of images.

6          MR. CHAMBERLIN:  Yes, Your Honor.

7          THE COURT:  And I'll do the same with him as I do

8    with every sex offender before this Court.

9          MR. CHAMBERLIN:  Yes, Your Honor.

10          And if Your Honor takes out that -- that 7 levels,

11   that would take his guideline range down to 70 to 87 months.

12   And, again, in -- in no way diminishing the seriousness of Mr.

13   Cutler's conduct.

14          This case is heartbreaking on a number of levels, and

15   we certainly acknowledge it's not a victimless crime.  But

16   it's -- it's also heartbreaking because of Kierre's age and a

17   lot of things that have transpired in his life.

18          He's 19 years of age.  I would ask the Court to take

19   into consideration that the vast majority of the offense

20   conduct in this case happened as a juvenile.  He -- he turned

21   18 actually on July 25, 2022.  He was arrested in October, and

22   the -- the conduct actually started as -- as early, according

23   to the police reports and the presentence report, as -- as late

24   in -- in 2020 and early 2021.

25          I would ask the -- the Court to take into

1  consideration, from the very inception of Kierre's life, it's

2  been a struggle.  When he was -- at birth, there's some

3  evidence that he may have suffered a traumatic brain injury.

4  There is evidence that he suffered a deprivation of oxygen and

5  was placed on a ventilator when he was in the NICU unit.

6           In the -- in the psychological report and the

7  psychosexual evaluation, it also indicated that there was a

8  potential -- just from the progression of some of his mental

9  health issues, there was a potential neglect or isolation in

10 his infant and toddler years, even though they didn't have --

11 he didn't have enough information on that.

12          There was a significant amount of instability in the

13 home, and Kierre was -- was a victim of -- of sexual abuse at a

14 very young age, and as a -- a result of the sexual abuse, which

15 occurred at his father's residence.  And then not long

16 thereafter, his father -- there's some evidence his father was

17 dating his mother's cousin, and as a result of that, he was no

18 longer allowed to be over at his father's house anymore.  And

19 his father basically abandoned the -- the relationship

20 somewhere about the age of ten years old, which -- which

21 Kierre's mother said had a profound impact on him.

22          The -- the sexual abuse was never talked about by his

23 parents and was never -- never addressed.  His mother then, in

24 2012, was seriously injured in an automobile accident, and as a

25 result -- it resulted in her being hospitalized for an extended

period of time. This happens at around -- similar age, around

eight years old, and -- and Kierre is going back and forth

between family members during this time that she's

hospitalized. And he was also somewhat traumatized because

he -- he saw her in the hospital, and -- and the nature of her

injuries, which were very serious.

He attended four different elementary schools, one

middle school. He was homeschooled in eighth grade and ninth

grade, and while he did attended two years of high school --

and -- and we'll never know the impact, but I always -- I

always -- I bring it up when -- when I look at this time frame,

but then he goes into online schooling in 2020. Pandemic

begins February of 2020 -- and -- and this goes to isolation,

which has -- has already started in Kierre's life where he's

basically not leaving the house or not leaving the room. He --

he's attached to his phone and to his computer, and he spends

long periods of time on his computer by himself. And it's not

long after this time that the -- the offense conduct in this

case starts.

He further deteriorates. He is -- he -- he's

hospitalized as early as -- as 15 years of age, and that leads

to one hospitalization after another. He's eventually kicked

out of the house at -- at 18 and is eventually living in a --

basically a homeless shelter, which is where he is when he's

arrested in October of 2022.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

1    I would contend that Dr. King did a very thorough

2  evaluation, and -- and, fortunately, there were a lot of

3  records that were available to her.  What makes Kierre's

4  diagnosis so difficult in this case is because of his age.  And

5  there's -- there's been preliminary diagnosis involving either

6  psycho-affective disorder, schizophrenia, ADHD, conduct

7  disorders.  But the problem is, a lot of these very serious

8  mental -- mental illnesses start around this age.  And that

9  colors this whole case.

10    And Dr. King said she couldn't even really make a

11 diagnosis as to any kind of pedophilic disorder because his --

12 because of his age, because of the mental illness, which is

13 just at the onset.  Kierre had -- had made statements to her

14 that really it wasn't because of attraction to these images of

15 these children.  It was more just like the horror in some of

16 these other awful videos that he was in possession of and liked

17 watching, that he was -- you know, he was -- liked watching it,

18 but didn't indicate that there was a sexual gratification from

19 watching these images.

20    Your Honor, I know that probably the chief concern

21 from the Court and the government in this case is protecting

22 the community.  We are asking the Court to consider a -- a

23 sentence of 60 months.  I would ask the Court to take that into

24 consideration largely because of his age, lack of any kind of

25 criminal history, and mental illness.  And a sentence of 60

months would allow Kierre to get the mental health treatment
that he needs.  And we're -- we're also asking the Court to
recommend a -- a unit in the Bureau of Prisons that has a
psychiatric unit available so he can get the treatment that he
needs.

But the -- the punishment and the protecting the
community doesn't end after that 60 months.  Probation has
recommended, and we're in agreement, with the term of ten years
of supervised release.  During that term of ten years, every
aspect of Kierre's life would be monitored by probation.  He
would not have access to the Internet.

And I would also ask the Court to take into
consideration that because of Kierre's isolation and -- and
mental health issues, he's not someone that has a lot of
friends.  He's not someone who's out interacting with a lot of
other people.  And I -- I also think the Court should take
that -- the Court should take that into consideration in terms
of weighing his danger to the community.  He really doesn't
interact with a lot of people.

In terms of specific deterrence, he's never been to
prison before.  He's never been charged with a crime before.
He is, again, very young, 19 years of age.  And he's suffering
from a very serious mental illness.

The Court should also take into consideration in
terms of the 3553(a) factors the need for treatment, which is

primary in this case, both when he's in the Bureau of Prisons

and when he gets out.  And I will -- obviously he has -- he has

not done well with treatment previously, but he hasn't been in

this situation where he finds himself today where he's facing a

lengthy prison sentence and additional jail time if he doesn't

comply with treatment while he's under federal supervision.

So we would respectfully ask the Court to find that a

sentence of 60 months complies with the sentencing purposes

under 18 U.S.C. 3553(a), along with a term of 10 years

supervised release.  Thank you.

THE COURT:  Thank you.

Yes, Ms. Gates.

MS. GATES:  Your Honor, we come before the Court and

in a position that I'm not usually in with these nonproduction

cases asking for a -- a guideline sentence.  This case is

unlike anything I have ever seen.  I -- I can't speak for the

Court, but -- about whether or not the Court has seen something

like this, but it -- it is truly concerning, things related to

the -- the nature and circumstances of the offense and -- and

to the history and characteristics of Mr. Cutler.

I understand the Court and -- and have been before

the Court before not agreeing with the use of computer and the

number of images.  Those are in -- in practically every case,

and they don't tell a whole lot about a person or -- the

Government contends that there are other aspects of the history

and characteristics and the nature and circumstances of the
offense that aren't taken into account in the guidelines that
would move the guideline range out of that which -- the 70 to
87 months.

I guess to -- to be clear, Mr. Cutler collects and
distributes sadistic and extreme child pornography.  The
descriptions -- which I won't repeat here -- are -- are just
unbelievable.  Atrocious.  And the seasoned detective in this
case, who's done numbers and numbers of cases of child
pornography, has -- had never seen anything like it before, as
it's noted in the PSR.  It's some of the worst stuff that he
has ever seen.  Nearly all of it involved bondage, sadism,
masochism.  This is the torture -- sexual torture of children,
and certain the -- that should be taken into consideration as
the seriousness of the offense and to provide just punishment.

I know there is an enhancement for that.  It's
typical for there to be some -- some amount of -- image of
bondage or pain, but these are sort of out of the norm as
opposed to maybe your typical case.

THE COURT:  So is that -- but that has already been
applied; right?

MS. GATES:  Yes.

THE COURT:  Yes.  Okay.  Uh-huh.

MS. GATES:  But I would argue that the -- the
entirety of the -- the content involving that does make it

1    different than your -- your typical -- typical case.

2            THE COURT:  I don't disagree with you.  This is one

3    of the most disturbing cases that I have seen.

4            The statements that this young man has made are just

5    scary, and he clearly needs a lot of help; there is no question

6    in my mind.  And I am sitting here thinking -- so you finish.

7    I just -- I don't -- this -- this is disturbing to this Court.

8    You need to understand.

9            But I don't know what you do with someone who was in

10   that position, other than protect the community from them.

11   My -- my number one job sitting here is, I must protect the

12   community.  And this, to me, feels like he can move into a

13   circumstance that will make him utterly dangerous to the

14   community, utterly dangerous.

15           Some of the statements he's made about wanting to

16   harm his mother, some of the -- and -- and -- I -- I mean, it's

17   -- it's -- this is serious.  This is serious.  And this is

18   torture.  And this is harming animals.  It's all the signs that

19   you see of someone who can -- who is -- who is seriously ill

20   and who is -- places anyone that may come in his path in

21   danger.

22           So I didn't mean to cut you off, but I -- this is a

23   -- this -- I just wanted you to know that this is a case that

24   has disturbed me tremendously.

25           MS. GATES:  Your Honor, and that's where -- the

```
 1    concerns that the -- that you have relayed are many of the same
 2    concerns the government has, and that's the reason why we are
 3    recommending a -- a sentence within the -- the guidelines that
 4    are calculated as such, particularly -- you know, I keep on
 5    using "concerning," but particularly concerning is his use of
 6    the phone.
 7            You know, he may not be able to interact with
 8    individuals in person, fine, but he has showed that he's able
 9    to interact online and use a phone as a source of getting child
10    pornography, sending this child pornography, distributing it to
11    others, and getting -- soliciting child -- minors to produce
12    child pornography and soliciting individuals to produce other
13    images of self-harm that are disturbing that include his
14    monikers, his names.  These are -- this behavior is not just
15    online downloading like the peer-to-peer or passively
16    downloading.  Online, he's engaged in activity trying --
17    attempting to exploit children directly.
18            Additionally, he is engaged in these online
19    communities that are concerning.  Like I said before, there's a
20    lot of cases that come before the Court where it's a peer to
21    peer or a more passive interaction that you see online engaged
22    in -- in groups, distributing, getting child pornography, and
23    discussing the sexual exploitation of children.
24            Now, whether or not he actually has a sexual interest
25    in that, you know, there -- the psychosexual seems to infer
```

1    that he may not.  It's inconsequential when that comes to play

2    because he's perpetuating and normalizing the behavior in

3    others, which is certainly concerning to the government, and

4    these online communities are -- and his engagement in them are

5    concerning.  I know you've read the PS- --

6              THE COURT:  He loves blood.  He said he loves blood

7    because it's beautiful.  I don't know what that means.  I do

8    not know what that means.

9              He's involved with satanic groups, torture of

10   animals.  These are all of the signs that you hear about

11   individuals that do some -- some things that are harmful to

12   communities as a whole.  I don't quite know what to do with

13   this.  I don't just quite know what to do with this.

14             Do you lock a 19-year-old up forever to keep him away

15   from everybody else?  What do you do?  I mean, I am going to

16   recommend -- because that's all I can do -- I'm going to

17   recommend he be housed at a facility where he can get mental

18   health treatment during the time of this, but this -- this is

19   -- this was more concerning than 90 percent of the other child

20   pornography cases that I've dealt with because of these

21   behaviors, these behaviors and his statements are just, in my

22   view, quite scary.

23             MS. GATES:  They -- they are scary to the government

24   as well, and certainly his mental health should be taken into

25   consideration.  There doesn't seem to be anything in -- in the

 1   psychosexual or the psychological report indicated that none of

 2   this was vol- -- involuntary or -- I mean, it -- it appears as

 3   though it's voluntary behavior.  He doesn't appear to be

 4   incompetent.  The --

 5           THE COURT:  It feels like he's more interested in

 6   torture than in sexual gratification.  It's the torture element

 7   that is the scary part for me.  And that -- and that bleeds

 8   over into his discussions is what is, to me -- I don't know

 9   what to do with it.

10           MS. GATES:  The -- Dr. King had indicated that it may

11   not be -- she was reluctant to diagnose him with pedophilia or

12   sadism, even though he met -- he met some criteria for that.

13           She indicated that -- that it was likely that this

14   was a means to be somebody as supposed to who he actually was,

15   but the means to be somebody is also problematic as well.  It

16   still causes harm to the community, and it still raises

17   concerns about protecting the public.

18           His whole identity seems to be wrapped up in this --

19   in online community and him -- she described being out of the

20   community is likely a total, basically, annihilation of himself

21   and his identity.  That raises some serious concerns as well

22   that his -- this is his identity.

23           I mean, he's had inter- -- interventions through

24   search warrants with law enforcement -- his -- his where his

25   phone is taken.  He's had his phone taken by his mother.  He

1    finds a way to get -- get these phones.

2            And what he -- what he not only does online is

3    harmful, but the statements that he made are very concerning,

4    and that he has these mental health issues, what is even more

5    problematic is that he has indicated that he did not think he

6    needed treatment in the past and that he doesn't need it now.

7            So what do we do regarding that?  And the

8    government's main concern, given what's in that psychological

9    report and what's throughout the PSR of what he's done, is just

10   protecting the public, and that's where the government is at

11   151 months.

12           Certainly understand the Court's concern about what

13   to do.  The government's in the same position with their own

14   position.  We're in a position to ultimately protect the

15   public, and that's certainly providing just punishment as well

16   and providing deterrence here for him.

17           But also for others involved in these groups.  I know

18   the Court has read the PSR.  The 764 Group, there's some

19   disturbing things that they're involved with.  I know he says

20   he's not part of it, but he's associated with them and been in

21   groups with them, and the conduct that he's done is the same

22   that's attributed to them.

23           Certainly a significant sentence would also --

24           THE COURT:  Now, what are you -- what are you -- I --

25   I'm not sure -- what are you referencing right now?

1        MS. GATES:  The -- the satanic groups that --

2        THE COURT:  Oh.  Oh.  Okay.  Okay.  That's what I

3   thought, but I thought -- it almost is as though you were

4   talking about something else.  I just wanted to make sure I

5   hadn't missed it.

6        MS. GATES:  No, Your Honor.

7        THE COURT:  Right.

8        MS. GATES:  The point being that a significant

9   sentence would hopefully deter others as well involved in this

10  type of activity.

11       THE COURT:  I think his case is out of the norm.  I

12  really do.  I think it's not -- I'm -- my concern is not

13  deterrence of others.  We've got somebody here that is truly, I

14  think, mentally ill.

15       And, clearly, I can protect the public for some

16  period of time, but you can't just lock somebody away forever

17  in hopes that somebody else won't get harmed.  I don't know --

18  I wish I had a better diagnosis of what was going on here and

19  the -- the likelihood of him literally acting some of this out.

20  But I don't have that.  And I -- and I understand probably why

21  I don't have it is his age.

22       But -- but he -- this -- this is -- this is serious.

23  And I understand what you're arguing for.  I'm not sure -- now,

24  the -- the -- probation did recommend the 87 months.  I didn't

25  even realize me taking off those two would put us right at 87

months.  That's where it puts us.

And -- and that's not -- for somebody who has never been in jail before, that is not a light sentence for someone who has never been in jail before -- and I do think -- I think he needs psychiatric help, whether he knows it or not.  Serious psychiatric help.

So I hear what you're saying, and you're asking for a longer sentence in hopes that that will at least protect the public for the 151 months.  But what he needs is treatment, and I don't know what to do except to commit him to the Bureau of Prisons and recommend that he be housed at a facility where he can get this mental health treatment.  And because he will be on such a long term of supervised release, we will know if things are not working well in the community.

And so I think that's why I have landed where I am landing.  I -- I -- everything you're saying, I -- I've gone through that in my head.  Everything you're saying.  Do I give him a longer sentence because these things do -- these things do impact me?  They impact me in a way that I am concerned about him.  I'm concerned about himself.  I'm concerned about his mother.  I'm concerned about a lot -- there's a lot going on here.  This is just not your standard child pornography case.  It is not your standard child pornography case.

This is about mutilation, satanic rituals.  He is truly disturbed, and -- but with those kind of circumstances,

1    we don't just lock them up and throw away the key.  We try to

2    get them the best help that we know how, and I think the fact

3    that we will have a lengthy supervised release term -- because

4    I'm actually thinking more in line of 15 years on the

5    supervised release.  Placing him in custody, putting him -- and

6    I'm going to order mental health treatment while he's in the

7    Bureau of Prisons, as well as while he's on supervised release.

8    And we will be aware if his behaviors move away from things

9    online to something more aggressive.

10           But, you know, I -- I -- this -- this one -- this one

11   has given me a lot of pause.

12           MS. GATES:  Your Honor, you summarized the

13   government's position.  You know where we stand.  I understand

14   your position.  I think there -- I have nothing further to say

15   regarding the government's position.

16           THE COURT:  All right.

17           Let's have the defendant to stand up.

18           THE DEFENDANT:  (Complies.)

19           THE COURT:  Sir, this is your opportunity to say

20   whatever you would like to say, including -- your family's here

21   if you want to turn and speak to them.  I don't have a problem

22   with that.

23           But the Court is about to sentence you.  I would --

24   if you would wish to be heard, I would encourage you not to

25   share anything that you have shared with your counsel

confidentially.  But I will hear from you at this time if you
care to be heard.

THE DEFENDANT:  No.

THE COURT:  All right.  All right.

And I understand it can be overwhelming all these
people talking about you and you just sitting there.  I get
that.  But this -- this one has troubled me.

But, as I indicated, in every one of these that I do,
I automatically take off the two for the computer.  And, in
this case, we take off -- the number of images is -- which --
where is the number of images?  That's a 5.  So we take 7 off,
and that puts us at a 27.

MR. CHAMBERLIN:  That's correct.

THE COURT:  And a one.  He has no criminal history,
never been in trouble before, but he is showing signs that he
is very troubled.  And the Court is going to sentence him -- I
do not feel it is right for me to impose things that I don't
impose on any other individuals that are in this circumstance,
but the Court is concerned, and I -- and I trust that we are
doing the right thing in this circumstance.

So the -- he is within that 70 to 87 months.  I do
think that is -- now, I have to say, sufficient and not greater
than necessary in order to meet the sentencing objectives, and
that's hard language for me to use right now.  I'm going to
stay with the information that I have at this point, he hasn't

```
1    done any of those things that I am concerned seriously --
2    harmed someone else that I am concerned about.  And with the
3    information that I currently have, and the lack of a diagnosis,
4    I do believe that this is the right and just sentence in this
5    case, and is sufficient and not greater than necessary in order
6    to meet the sentencing objectives.  And that is 87 months.
7            I am going to follow that 87 months with 15 years of
8    supervised release.
9            I am going to -- wait just a minute.
10           So the defendant is hereby committed to the custody
11   of the Bureau of Prisons for a term of 87 months, followed by
12   15 years of supervised release.
13           I am ordering him to pay a special assessment of
14   $100, which is due and payable immediately.  To the extent he
15   cannot immediately comply, the Court will recommend that he
16   participate in the Inmate Financial Responsibilities program.
17           I am -- as it relates to the other assessment, the
18   JTVA assessment, it does appear that this defendant is
19   indigent, based on all of the information that I have.  And,
20   therefore, I am not going to recommend -- I'm not going to
21   order that assessment.  I am going to order a $1,000 assessment
22   under 18 U.S.C 2259A.  Further fine is waived due to
23   inability -- a further fine is waived due to inability to pay.
24           I am ordering the restitution of $13,000 to the
25   individuals outlined in Docket Number 28, which is the --
```

let me -- let me pull that out.  The stipulation regarding
restitution.  The victims are outlined as follows:  April,
Jenny, Sloan, Tara, Sloan, Vicky-Lily,  So those -- April,
Jenny, Sloan, and Lilly.  So 3,000 to victim April; 4,000 to
victim Jenny; 3,000 to victim Sloan, and 3,000 to victim Lily.
Total restitution of $13,000.  We got that.

        When the defendant is released from the Bureau of
Prisons, he shall abide by all of the regular terms
of supervised -- all of the standard terms -- no, no, no --
mandatory terms of supervised release.

        Have you discussed with him the mandatory terms?

        MR. CHAMBERLIN:  Yes, Your Honor.

        THE COURT:  And are any of those objected to?

        MR. CHAMBERLIN:  No, Your Honor.

        THE COURT:  I am going to order all the standard
terms of supervised release, as well as the special terms, as
follows:  That Defendant shall cooperatively participate in a
mental health treatment program, which may include inpatient
treatment, and shall pay for such services, as directed by the
probation officer.  The defendant does have mental health
diagnoses, as reflected in the mental and emotional health
section of the PSR.  And this is ordered to assist him in
addressing those mental health issues.

        Now, let me ask the probation officer:  Have you
received -- have you incorporated any of the things that were

```
 1    outlined in the psychological report?
 2            PROBATION:  In the PSR?
 3            THE COURT:  In the PSR.
 4            PROBATION:  Yes, Your Honor.
 5            THE COURT:  Okay.  So -- oh, as -- okay.  I see them
 6    now.
 7            PROBATION:  Yeah.
 8            THE COURT:  I do see them.  I see them.  Okay.
 9            All right.  The defendant shall cooperatively
10    participate in an evaluation and a mental health program with
11    emphasis on sex offender treatment and shall pay for such
12    services as directed.
13            The defendant must submit to any risk assessment;
14    psychological and physiological testing, that may include, but
15    not limited to, visual reaction time measurement of sexual
16    interests and/or used for prescribed medications, or other
17    specific tests to monitor Defendant's compliance, as directed
18    by the probation office.  This is based on his conduct under
19    these circumstances as well as the psychological evaluation
20    that was performed on him.
21            The defendant shall submit to substance abuse testing
22    as directed by the probation officer.
23            Now, I didn't recall -- and it may be that I was so
24    focused on the other -- does he have...
25            MR. CHAMBERLIN:  There was just some marijuana --
```

1    some limited marijuana and LSD use that was pretty limited.

2          THE COURT:  All right.  I do remember that now, now

3    that you said that.

4          I will order the -- the substance abuse testing and

5    treatment, and any recommended treatment, which may include

6    drug testing and inpatient or residential treatment, and that

7    he shall pay for such services as so directed.  The defendant

8    has a history of a moderate level of substance abuse, but I

9    believe at 19 years of age we need to address it so that it

10   doesn't become more pronounced.

11         The defendant shall not incur new credit card charges

12   or open additional lines of credit without approval of the

13   probation office.  This is due to the restitution that he must

14   pay as a part of this judgment.

15         The defendant shall provide any requested financial

16   information to the probation officer, and that's to ensure that

17   any finances that he does in fact have are used for this

18   restitution.

19         Restitution in the amount of $13,000 is due and

20   payable immediately, as I indicated, with reference to Document

21   28 of the PSR.

22         In the event the entire amount of criminal monetary

23   penalty imposed is not paid prior to the commencement of the

24   term of supervised release, the defendant shall make payments

25   in equal monthly installments of $100, to begin 60 days after

1    commencement of the supervised release, and continuing during

2    the entire term of supervised release, until paid in full.

3            I will waive the interest on these monies due to the

4    amount that this gentleman has to pay.

5            The assessment, I did -- I am ordering that

6    assessment under 18 U.S.C 2559A in the amount of $1,000, which

7    is due and payable immediately.  In the event that that cannot

8    be paid -- has not been paid prior to him being placed on

9    supervised release, that these monies shall become payable

10   within the 60 days of his commencement of his supervised

11   release, and monthly installments of $50 per month to be paid

12   thereafter.  Again, the Court will waive interest on these

13   monies.

14           The defendant shall submit to polygraph testing as

15   directed by the probation office.  This is recommended as a

16   tool to develop an individualized clinical treatment plan

17   reflective of his needs.

18           The defendant shall not have any contact, other than

19   incidental contact in a public forum, as -- such as ordering in

20   a restaurant, grocery shopping, with any person under the age

21   of 18 without prior permission of the probation officer.  Any

22   approved contact shall be supervised by an adult at all times.

23   The contact addressed in this condition includes, but is not

24   limited to, direct or indirect personal, telephonic, written,

25   or through a third-party.

1    If the defendant has any contact with any child,

2  person underage not otherwise addressed in this condition, he

3  is required to immediately remove himself from that situation

4  and notify the probation office within 24 hours.

5    The defendant shall not access, view, purchase,

6  possess, control, send, or receive any visual depictions,

7  including any photographs, film, video, pictures, or

8  computer-generated images of sexually explicit conduct or any

9  material constituting or containing the obscene visual

10  representation of the sexual abuse of children as defined under

11  18 U.S.C Section 14669A.  Based on -- this is based on the

12  information contained in the offense conduct in this case.

13    The defendant shall not possess or use a computer or

14  any other means to access any online computer service at any

15  location, including employment, without the prior approval of

16  the probation officer.  This includes any Internet service

17  provider, peer-to-peer network, or file-sharing program, or any

18  public or private computer network.  If granted access to an

19  online computer service, the defendant shall consent to the

20  probation office conducting periodic or unannounced

21  examinations of any Internet-capable device or computer

22  equipment, which may include hardware, software, and related

23  computer peripherals.  This may also include the removal of

24  such equipment, when necessary, for the purpose of conducting

25  an examination.  This is based on his possession of illicit

```
 1    child pornography.

 2            The defendant shall submit to a search of his person,

 3    property, house, residence, vehicle, papers, computer, or any

 4    electronic communication or data storage devices or media and

 5    affects at any time, with or without a warrant, by any law

 6    enforcement officer or probation officer with responsible --

 7    with reasonable suspicion concerning unlawful conduct or a

 8    violation of a condition of probation or supervised release.

 9            Based on the information contained in the offense --

10    this is based on the information contained in the PSR with

11    respect to his offense conduct in this case.

12            Now, what I was talking about is the -- let me find

13    where we put the psychological report.

14            The psychologist recommended some specific...

15            PROBATION:  Paragraph 83.

16            THE COURT:  It's on -- it's paragraph 83?

17            PROBATION:  Yeah.

18            THE COURT:  Oh, okay.  That's where it is.  In the

19    PSR?

20            PROBATION:  Yes, Your Honor.

21            THE COURT:  Okay.  Let me -- let me look here.

22            So you've got that information.  I want these

23    recommendations to go to the Bureau of Prisons as well.  So 83?

24            PROBATION:  Yes, Your Honor.

25            THE COURT:  Okay.  You've -- you've got it.
```

```
 1              All right.  Yes.  And I want specifically to
 2    recommend that the Bureau of Prisons follow this recommended
 3    treatment by the psychologist that is outlined in -- in
 4    paragraph 83 of the PSR.  That does cover what the Court was
 5    concerned about.
 6              All right.  Are there other recommendations to -- did
 7    I finish those special terms?  I've got a lot going on.
 8              PROBATION:  Yes, Your Honor.
 9              THE COURT:  Okay.  I finished the special terms.
10              All right.  So I am going to recommend vocational
11    training while he is in the Bureau of Prisons.  Clearly, of
12    course, mental health.  Clearly substance abuse.  I am asking
13    that the Bureau of Prisons take seriously these recommendations
14    being made in paragraph 83 in the PSR.
15              All right.  Are there other...
16              MR. CHAMBERLIN:  And, Your Honor, I -- I don't know
17    if it would help, at least in the judgment, specifically to
18    recommend a psychiatric unit or facility within the Bureau of
19    Prisons that can potentially address a possible traumatic brain
20    injury.  I know that we've already basically incorporated that
21    in paragraph 83.  That's the -- that's the -- the -- the most
22    important recommendation.
23              THE COURT:  That -- that is.  I agree.  That's what I
24    was looking for.  That's why I was trying to make sure that
25    that recommendation was in there.
```

1          I do recommend that he be housed at a facility where

2   his special needs can be met, mental health needs, which does

3   include assistance because of that traumatic brain injury, as

4   well as, I do want all this other stuff addressed regarding

5   this satanic behavior and -- and statements he has made are

6   really concerning.

7          So will we ensure that the Bureau of Prisons has this

8   psychological evaluation?  How does that work?

9          MR. CHAMBERLIN:  Your Honor, if I -- if I can make a

10  motion -- and Mr. Adegun did a very good job summarizing the

11  psychosexual evaluation --

12         THE COURT:  He did.

13         MR. CHAMBERLIN:  -- but if I could make a motion to

14  modify the presentence investigation report to include the full

15  psychological report so they have everything.

16         THE COURT:  I would like that.  I -- and your motion,

17  I think, will be allowed.  I see you're about to stand up.

18         PROBATION:  We don't have any issues with that.  I

19  can update that.

20         THE COURT:  All right.  I do want them -- I want them

21  to see those statements.  I think -- I think they have got to

22  be addressed.

23         PROBATION:  Yes, Your Honor.

24         THE COURT:  All right.

25         MR. CHAMBERLIN:  And, Your Honor, secondary, would

| | |
|---|---|
| 1 | the Court also recommend that he be housed in a facility -- |
| 2 | secondary to getting him to a psychiatric unit -- as close to |
| 3 | home as possible?  One of the themes in -- in Dr. King's report |
| 4 | is sort of a long history of isolation, and there will be a |
| 5 | time when Mr. Cutler is released, and his mother does love him |
| 6 | dearly and is a positive -- |
| 7 | THE COURT:  I know she does. |
| 8 | MR. CHAMBERLIN:  -- support system, and I think it is |
| 9 | important, if possible, you know, that she has access to him |
| 10 | and he has -- that's his sole support. |
| 11 | THE COURT:  I will, as a secondary.  It's got -- he's |
| 12 | has got to be placed -- |
| 13 | MR. CHAMBERLIN:  Right. |
| 14 | THE COURT:  -- in the right facility.  He needs a lot |
| 15 | of help.  And he's got to be placed in the right facility.  But |
| 16 | as a secondary recommendation, I will recommend that he be |
| 17 | housed at a facility as close to his mother and family as |
| 18 | possible. |
| 19 | Now, where is that? |
| 20 | MR. CHAMBERLIN:  That's Winston-Salem. |
| 21 | THE COURT:  That's Winston-Salem.  All right.  So |
| 22 | Winston-Salem.  All right? |
| 23 | MR. CHAMBERLIN:  And then lastly, we make a motion to |
| 24 | dismiss the remaining count, which is Count 2. |
| 25 | THE COURT:  Will allow the dismissal of the remaining |

         count.

    2           MS. GATES:  And, Your Honor, you issued an order of

    3    forfeiture on March 12, 2024, that's Docket Number 25.  We

    4    would ask that that be incorporated.

    5           THE COURT:  I will incorporate my order of forfeiture

    6    in this case.

    7           MS. GATES:  Thank you, Your Honor.

    8           THE COURT:  Thank you.

    9           Anything further?

   10           MR. CHAMBERLIN:  Just appeal rights.

   11           THE COURT:  Now, I'm going to ask you to discuss with

   12    your client any rights of appeal he may have to this Court's

   13    sentence, and if he is going to appeal this sentence, he must

   14    do so within 14 days of this Court's judgment.

   15           MR. CHAMBERLIN:  Yes, Your Honor.  Thank you.

   16           THE COURT:  Thank you.

   17           To his family, I -- he does need you, and he needs

   18    your support.  And -- and I hope he can get the treatment that

   19    he needs while in the Bureau of Prisons.

   20           All right.

   21           Yes, ma'am, anything further from the government?

   22           MS. GATES:  No, Your Honor.  Nothing further.

   23           THE COURT:  All right.

   24           All right.  He is in your custody.  Let us adjourn

   25    court.

1    (The hearing concluded at 1:17 P.M.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

```
 1                        CERTIFICATE

 2        I, Stacy Harlow, Realtime Verbatim Reporter-Master,

 3   Certified Verbatim Reporter-Master, Certificate of Merit,

 4   Registered Broadcast Captioner, Registered CART Provider, and

 5   Official Reporter of the United States District Court for the

 6   Middle District of North Carolina, do hereby certify that the

 7   foregoing is a true and correct transcript of the proceedings

 8   had in the above-styled action on March 20, 2024, as reported

 9   by me by stenomask.

10        I certify that the transcript fees and format comply with

11   those prescribed by the Court and the Judicial Conference of

12   the United States.

13        Given under my hand this 1st day of April, 2025.

14
                              _____
                                       _Stacy Harlow_
15                            STACY HARLOW
                              Official Reporter, United States
16                            Middle District of North Carolina

17

18

19

20

21

22

23

24

25
```